## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
WILLIAM TODD LEE                               )
                                               )
    *Plaintiff,*                            )
                                               )
    v.                                    )    Case No. 06-0884 (JDB)
                                               )
THE HONORABLE FRANCIS J. HARVEY                )
Secretary of the Army                          )
                                               )
    *Defendant.*                           )
_____)

### PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S
### MOTION TO DISMISS OR FOR SUMMARY JUDGMENT

Plaintiff, Colonel (ret) William Todd Lee, respectfully submits this memorandum in opposition to Defendant's motion to dismiss or for summary judgment, and in support of his cross-motion for summary judgment. Colonel ("COL") Lee demonstrates below that he has stated claims upon which relief may be granted. He further demonstrates that there are material facts in dispute requiring the denial of Defendant's motion for summary judgment and the ordering of discovery.

## I.  INTRODUCTION

This case involves important questions of the applicability of the amendment provisions of the Privacy Act to findings of fact contained in administrative investigation records and to documents recording adverse personnel actions that are based solely on the factual findings of the administrative investigation. The factual and legal issues presented here require this Court to reconcile apparent conflicts in the existing case law as to what constitutes a factual record

subject to amendment under the Privacy Act, and what constitutes an opinion or judgment of a federal official beyond the reach of the Privacy Act's amendment provisions.

COL Lee argues below that the pertinent Army administrative investigation conducted pursuant to Army Regulation ("AR") 15-6 is a Privacy Act record contained within a system of records. He further argues that the findings of fact contained therein are just that—findings of fact. They are not judgments or opinions of military officials, as Defendant contends. COL Lee further argues that records containing judgments and opinions based solely on erroneous findings of fact also are subject to amendment or removal.

Two factual findings by Defendant are at issue here: (1) that COL Lee falsified his resume; and (2) that he misused government resources. The administrative record ("Admin. Rec.") filed in this case contains compelling evidence that the factual findings in question are inaccurate and grossly erroneous. Apart from the question of whether the AR 15-6 report of investigation is contained in a "system of records" for Privacy Act purposes, the only remaining material fact in dispute is whether the findings of fact against COL Lee are accurate. Summary judgment therefore is inappropriate. *See Doe v. United States*, 821 F.2d 694, 710 (D.C. Cir. 1987) (Judge Mikva, dissenting).

## STATEMENT OF FACTS

COL Lee served the Army and our nation honorably for more than 29 years. Compl. ¶ 14. Until the administrative actions giving rise to this suit, COL Lee's honesty and integrity were never questioned. He is the recipient of numerous awards and commendations, to include the Legion of Merit.

After the tragic events of September 11, 2001, COL Lee was mobilized to perform active duty in the Office of the Chief, Army Reserve ("OCAR").  Compl. ¶ 15. He arrived at the Pentagon to begin his duties on September 17, 2001, six days after the terrorist attacks of September 11, 2001. *Id.*  COL Lee was mobilized to meet the OCAR requirement for round-the-clock staff supervision in the wake of those attacks, and because of his extensive prior experience in war planning and force integration activities. Compl. ¶ 16.

COL Lee's official position and title during his mobilization period was Director of Staff. COL Lee's position was documented on the OCAR Mobilization Table of Distribution and Allowances (TDA), and was a personnel authorization intended to meet the increased manpower requirements of mobilization and war.  Compl. ¶ 17.  COL Lee shared that title with COL (ret) Terry W. Lerch.  *Id.*

COL Lerch was aware of COL Lee's job title, and raised no objections or concerns about sharing the title with COL Lee. In practice, COL Lee was 'wartime' Director of Staff while COL Lerch served as 'peacetime' Director of Staff.  Compl. ¶ 18.  The division of staff supervision was as follows: COL Lee served as Director of Staff for all non-administrative matters, principally for all activities in support of Operation Enduring Freedom. Compl. ¶ 19.  COL Lerch exercised staff supervision responsibilities for administrative matters.  *Id.*  While serving as Director of Staff, COL Lee was directly supervised by COL (ret.) Malcolm B. Westcott. COL Lee's second-line supervisor was LTG Thomas J. Plewes, then-Chief of the Army Reserve. Compl. ¶ 20.

During his period of mobilization, COL Lee performed numerous duties in addition to those required by the position of Director of Staff. COL Lee also exercised supervisory duties

3

when serving as Acting Executive Officer to the Chief, Army Reserve (January 2002 through May 2002), and  Acting Chief, Army Reserve, a position he occupied on several occasions in the absence of the Chief, Army Reserve.  Compl. ¶ 21.

COL Lee exercised supervisory responsibilities that included tasking subordinate officers and civilians, monitoring their compliance with work directives, fielding questions, and providing advice and guidance. COL Lee performed these supervisory functions independent of Mr. Lerch. COL Lee also performed these functions when Mr. Lerch was unavailable, and when required after official duty hours. COL Lee regularly tasked his staff without regard to his staff's peacetime rating chain.  Compl. ¶ 22.

After completing his one-year mobilization period in October 2002, COL Lee was retained on active duty for medical evaluation. He had suffered a heart attack during his mobilized service and had a number of other service-related medical conditions and disabilities that required evaluation prior to his retirement from the Army. Compl. ¶ 23.

In January 2003, COL Lee was invited to accept the civilian position of Program Integrator, OCAR Chief Information Office (later named Enterprise Service Activity). The invitation resulted from a competitive selection process in which COL Lee competed with several other individuals. On March 23, 2003, COL Lee reported to work at the Pentagon as Program Integrator. In September, 2003, the Army transferred COL Lee, along with his position, to Ft. McPherson, GA. Compl. ¶¶ 25-26.

**Army Regulation ("AR") 15-6 Investigation**

In December 2003, LTG James Helmly, Chief, Army Reserve, directed an investigation under AR 15-6 based on anonymous allegations that COL Lee unlawfully arranged his transfer

to Ft. McPherson, received unauthorized TDY travel reimbursements, and improperly used his government cell phone. Compl. ¶ 27; Admin. Rec. at 32-33.  The scope of the investigation was later broadened to include all circumstances surrounding COL Lee's employment. Compl. ¶ 27.

LTG Helmly selected as his investigating officer COL Patricia McDaniel, SJA, USAR, a Reserve officer and attorney then mobilized and assigned to Ft. Hood, Texas. Admin. Rec. at 32-33.  COL McDaniel commenced her investigation on December 23, 2003. She completed her report of investigation on February 25, 2004. Admin. Rec. at 00-01.

After reviewing the available evidence, COL McDaniel issued the following findings of fact: 1) COL Lee never actually performed the job that he was ostensibly hired to perform at OCAR; 2) COL Lee resided in Atlanta, GA from the outset of his employment notwithstanding the fact that he was ostensibly hired to work in Washington, DC and was paid for that location; 3) COL Lee misused his cell-phone and that misuse resulted in $1,028.25 improperly paid by the government; 4) COL Lee improperly traveled TDY to his permanent duty station with the approval of his supervisor, Mr. Arthur (Rick) Taylor; and 5) COL Lee misrepresented his qualifications on his "RESUMIX" resume, such qualifications being the determining factor for eligibility to serve at the GS-15 level.  *Id.*

**Actions to Terminate COL Lee's Employment**

Based solely on COL McDaniel's findings of fact, by memorandum dated March 16, 2004, BG James Kelley informed COL Lee that he intended to remove him from the position of Program Integrator and terminate his federal service employment. BG Kelley cited two reasons for the proposed removal and termination: 1) COL Lee's alleged falsification of his resume; and

2) alleged misuse of government issued cell-phone. Admin. Rec. at 532-533. Only these allegations, therefore, constituted the basis for the proposed adverse actions.

In response to requests from COL Lee and his counsel for additional time to respond to the proposed removal and termination, by memorandum dated March 29, 2004 BG Kelley withdrew and cancelled the March 16, 2004 notice. According to BG Kelley, he took this action "[i]n the interest of affording [COL Lee] the opportunity to fully respond to the allegations and because your probationary period has expired....." Admin. Rec. at 534-535.

In the same memorandum, BG Kelley again advised COL Lee that he was proposing COL Lee's removal and termination based on the same two grounds presented in the March 16, 2004 memorandum. *Id*. On April 13, 2004, COL Lee submitted to BG Kelley materials responding to the second notice of proposed removal and termination. COL Lee's submission included 15 exhibits containing documents demonstrating, among other things, that the allegations were baseless. Admin. Rec. at 537-669.

By memorandum dated April 20, 2004, BG Kelley informed COL Lee that his actions "do not warrant removal." BG Kelley maintained, however, that the charges of falsification of resume information and misuse of a government cell-phone were supported by a preponderance of the evidence. In the same communication, BG Kelley notified COL Lee that the following actions would be taken: 1) 14 day suspension from employment without pay; and 2) placement of a copy of Standard Form 50, Notification of Personnel Action, in COL Lee's Official Personnel Folder. COL Lee was suspended from employment from May 2, 2005 through May 15, 2005. COL Lee returned to duty on May 17, 2005. Admin. Rec. at 595-596.

**EEO Complaints**

On June 2, 2004, COL Lee initiated contact with an Army Reserve EEO counselor alleging that the personnel actions taken against him were discriminatory.  Admin. Rec. at  673. Specifically, COL Lee alleged that the personnel actions were a guise for transferring his duties and responsibilities to a younger, healthier, African-American female. In his informal complaint, COL Lee stated, "…I was subjected to an unprecedented AR 15-6 investigation of my initial employment and subsequent activities. That investigation (authorized by LTG Helmly) led to numerous false accusations and incorrect findings (approved by LTG Helmly) of misconduct on my part. I was subsequently threatened with termination during my probationary period, which apparently failed because the command was unable to process the termination before my probationary period ended. I was then threatened with termination for misconduct (misuse of a government cell phone and intentional falsification of my resume). My responses to those charges should have resulted in my exoneration, however, the charges stood and I was given a two-week suspension. That punishment and successive acts by Dr. Wiener have put my current career and employment at risk."  Admin. Rec. at 673.

Because COL Lee's complaint was not resolved through the informal EEO procedure, the Army advised COL Lee by memorandum dated August 16, 2004 of his right to file a formal EEO complaint, which COL Lee did by letter dated September 7, 2004. The formal complaint was deemed untimely by the Army (Admin. Rec. 705) and subsequently by the U.S. Equal Employment Opportunity Employment Commission (Admin. Rec. 725-727).

In his formal complaint, COL Lee, through counsel, noted, "[t]he AR 15-6 investigation was fatally flawed in numerous respects, and the nature of the errors strongly reinforces the

appearance of undue command influence in the investigative process. For instance, the investigating officer failed to consider exculpatory evidence submitted by COL Lee, and she failed to question individuals identified by COL Lee with information highly relevant to the investigation. She failed to identify and employ objective measurements for determining whether misconduct existed, with the result that several key findings of her investigation were later refuted." Admin. Rec. at 700.

In his formal complaint, COL Lee, through counsel, requested the following relief: "(1) Cease all efforts to terminate his employment or eliminate his position; (2) Cease all acts of discrimination, retaliation, and harassment; (3) Revoke any findings of misconduct relating to the AR 15-6 investigation; (4) Revoke a two-week suspension without pay imposed in May, 2004; (5) Award him compensatory damages of an as-of-yet unspecified amount; and (6) Award attorney fees for costs expended in pursuit of this action." Admin. Rec. 702-703.

**Privacy Act Amendment Request**

In COL Lee's initial amendment request and on appeal, he provided documentary evidence, which included affidavits from COL Westcott, LTG Plewes, and others, demonstrating that the records he seeks to amend are factually incorrect. Admin. Rec. at 728-765. In regard to the finding that COL Lee falsified his resume, he provided sworn affidavits from his two immediate supervisors, COL Westcott and LTG Plewes, who stated that COL Lee performed all the duties listed on his resume and that he did not falsify his resume.

According to COL Westcott, "I categorically state that the allegation that Mr. Lee falsified his resume is untrue. During the period in question, I served as the Deputy Chief of the Army Reserve. I was Mr. Lee's immediate supervisor. Mr. Lee's job title was Director of Staff.

8

Mr. Lee shared equal responsibility for supervising the entire OCAR staff along with COL (ret) Terry Lerch." (Emphasis added.)   Admin. Rec. at 737.[1]

LTG Plewes stated, "COL Lee's active service as Director of Staff began on 17 September 2001, shortly after the terrorist attacks of 11 September 2001. …In this mobilization augmentation position, as is common practice, <u>COL Lee shared the job title and actual OCAR staff supervision responsibilities with COL Terry Lerch</u>, the peacetime [Director of Staff]. COL Lerch retained responsibility and authority for OCAR staff administrative functions; <u>COL Lee assumed responsibility and authority for OCAR staff functions relating to Operation Enduring Freedom</u>." (Emphasis added.)  Admin. Rec. at 735-736.

In regard to the finding that COL Lee misused his government cell phone, COL Lee submitted official documents demonstrating that the investigating officer did not exercise due diligence, failed to consider readily available evidence, and improperly used erroneous inferences and assumptions in arriving at her factual findings. Admin. Rec. at 747-763 (the exhibits were not included in the administrative record).

After considering COL Lee's rebuttal to this allegation, BG Kelley determined that approximately 30% of the calls found "disallowed" by the investigator were in fact appropriate cell phone usage. Compl. ¶ 45.   Notably, COL Lee received an exceptional performance appraisal for the time period in question. BG Kelley endorsed the appraisal.  Compl. ¶ 46.

---

[1] The Administrative Record served on COL Lee does not appear to contain the numerous exhibits to COL Lee's Privacy Act amendment request, including the referenced affidavits. Undersigned counsel, via e-mail dated September 5, 2006, asked counsel for Defendant to either identify the materials or immediately supplement the record with those materials.

**Consideration of COL Lee's Amendment Request by the Army**

In his application for the amendment of records pursuant to the Privacy Act, COL Lee requested the following amendments/corrections: "1) the AR 15-6 Report of Investigation ("ROI") be amended to show that the allegations addressed here were unsubstantiated; 2) the proposed termination of COL Lee's employment, issued by MG Kelley, be amended to show that such action was not taken; 3) the notice of suspension of employment be amended to show that such action was not taken; 4) the Standard Form 50 reflecting his 14-day suspension of employment and the reasons therefore be amended to show that such action did not occur; and 5) any and all other documents associated with or generated by the AR 15-6 investigation be amended to show that the allegations were unsubstantiated."  Admin. Rec. at 731.

By undated letter, Lieutenant Colonel ("LTC") Howard Roth, Chief, Civilian and Administrative Law, informed counsel for COL Lee that "[y]our request to amend certain records pertaining to Mr. William Todd Lee was referred to our command for review. We have determined that the AR 15-6 investigation referred to in your correspondence is an agency not a privacy record and is therefore not subject to amendment under the provisions of the Privacy Act. We have returned the action to North Central Regional Civilian Personnel Operations Center at Rock Island, IL for further action."  Admin. Rec. at 766.

By letter dated 14 February 2006, Ms. Patricia A. Ofslager, FOIA Officer, Civilian Personnel Operations Center, North Central, informed counsel for COL Lee that "[t]he request to amend records which you have filed on behalf of Mr. Lee seeks to correct the conclusions and opinions reached in the AR 15-6 proceedings and to rectify various alleged errors and omissions in the conduct of the investigation. These areas are not subject to alteration under the Privacy

Act. The Privacy Act does not allow an agency to alter records that accurately reflect an administrative decision, no matter how contestable the conclusions may be. Based on our review, the records in Mr. Lee's personnel file pertaining to the AR 15-6 proceedings accurately reflect the decision reached and the bases for that decision. We, therefore, must respectfully decline your request." Admin. Rec. at 771-772.

By letter dated 28 April 2006, BG Oscar R. Anderson, Chief of Staff, USARC, informed COL Lee of his proposal to remove him from federal service. In attempting to justify the proposed action, BG Anderson stated, "I have considered your employment record, including the fact that you have approximately three years of Federal civilian service to your credit. I also have considered your previous record of discipline. You were suspended for 14 days in May 2004 for falsification of your resume in your job application and misuse of government resources. Your conduct has resulted in a complete loss of trust in you." Compl. ¶ 50.

## STANDARD OF REVIEW

### Federal Rules of Civil Procedure Rules 12(b)(1) and 12(b)(1)(6)

A motion to dismiss under Fed. R. Civ. P. 12(b)(1) may be granted only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Empagran S.A. v. F, Hoffman-LaRoche, Ltd.*, 315 F.3rd 338, 343 (D.C. Cir. 2003) (citations omitted). The standard is the same for a motion made under Fed. R. Civ. P. 12(b)(6). *Sparrow v. United Air Lines, Inc.,* 216 F.3rd 1111, 1114 (D.C. Cir. 2000). In evaluating a motion to dismiss, the court must presume that plaintiff's factual allegations are true and draw all reasonable inferences in plaintiff's favor. The court also must resolve all factual doubts in favor of the plaintiff. *Calloway v. Brownlee*, 366 F. Supp. 2d 43 (D.D.C. 2005).

11

**Federal Rule of Civil Procedure Rule 56(c)**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. V. Catrett*, 477 U.S. 317 (1986), quoting Fed. R. Civ. Proc. 56 (c)). "In our view, the plain language of Rule 56 (c)) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning a central element of the non-moving party's case necessarily renders all other facts immaterial." *Id.*, at 322-323.

"As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.

Once the moving party has met this burden, the non-moving party "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Electric Industrial Co., Ltd., v. Zenith Radio Corp.*, 465 U.S. 574, 587 (1986), quoting Fed. R. Civ. Proc.

56(e). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Id.*, at 587 (internal quote omitted).

## ARGUMENT

### 1.  The Records COL Lee Seeks to Amend are Privacy Act
### Records Contained Within a System of Records

Defendant argues that the records COL Lee seeks to amend are not contained within a "system of records" as required by the Privacy Act. Defendant, however, only addresses the AR 15-6 report of investigation. COL Lee also seeks to amend the notices of proposed removal, the notice of suspension without pay, and the Standard Form 50 - notice of personnel action. Defendant does not argue that the latter records are not maintained in a Privacy Act system of records, and the records clearly are maintained in such as system (COL Lee's official personnel file). Because Defendant tacitly concedes that the latter records are maintained in a "system of records," COL Lee's argument here is restricted to the AR 15-6 report of investigation. Even if the Court accepts Defendant's argument as to the AR 15-6 report of investigation, summary judgment would be improper in the absence of *de novo* consideration of the matter at bar.

Defendant is correct in stating that the Privacy Act defines a "system of records" as "a group of records under the control of the agency from which information is retrieved by the name of the individual or by some other identifying number, symbol, or other identifying particular assigned to the individual."   Def.'s Mem. at 12 (quoting 5 U.S.C. § 552a(a)(5)). Importantly, the Act also defines a "record" as "any item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, his education, financial transactions, medical history, and criminal or employment history and that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual, such as a finger or voice print or a photograph."  5 U.S.C. § 552a(a)(4). Because the

13

ROI in question contains COL Lee's name and social security number, it is a "record" for Privacy Act purposes.

Defendant also quotes from Office of Management and Budget ("OMB") guidelines that require that there must be an "indexing or retrieval capability using identifying particulars [that is] built into the system," and the agency must "in fact, retrieve records about individuals by some personal identifier." *Id.*  (Emphasis added.)

In support of his argument, Defendant cites *Henke v. United States DOC*, 83 F.3d 1453 (D.C. Cir. 1996). In *Henke*, the D.C. Circuit noted, "…this court and others have previously concluded that retrieval capability is not sufficient to create a system of records." *Id.*, at 1460.  In the same decision the court approvingly cited *Bartel v. F.A.A.*, 725 F.2d 1403, 1408 (D.C. Cir. 1984), and in particular the finding that "[t]o be in a system of records, a record must … *in practice* [be] retrieved by an individual's name or other personal identifier."

As evidence that the AR 15-6 report of investigation is not contained within a "system of records" as required by the Privacy Act, Defendant submits the declaration of Ms. Annette Fears, Administrative Officer in the Office of the Staff Judge Advocate for the United States Army Reserve Command. According to Defendant and Ms. Fears, "ROIs are not filed or retrieved by name, social security number, or any other personal identifier. To the contrary, the ROI was assigned a log number under the automated Case Management System. This log number was (and is) used for filing and retrieving the ROI."  Def.'s Mem. at 12-13.  (Emphasis added.)

The declaration of Ms. Fears admits that COL Lee's ROI is assigned a log number and maintained in an automated case management system. That certainly approximates a Privacy Act record maintained in a "system of records" as defined by 5 U.S.C. § 552(a)(5) and as elaborated by OMB. The only question that remains is whether the ROI "in fact" and "in practice" is

retrieved by COL Lee's name, social security number, or other identifier personal to him. Ms. Fears' declaration and Defendant's argument do not satisfactorily answer that question.

Defendant's submission does not adequately explain why the Department of the Army routinely discloses AR 15-6 reports of investigations and those generated by Department of the Army Inspector General (DAIG) investigators in response to Privacy Act disclosure requests. Nor does Defendant's argument reveal how it would be possible for a requester to identify the ROI sought to be released since the requester will have no idea what case log number is assigned to the ROI which pertains to him or her.

The fact of the matter must be that even though the ROI is assigned a log number under the automated Case Management System, personal identifying information also must be entered that allows the agency to retrieve ROIs sought by the person to whom the ROI pertains.  If no personal identifier is used to store and retrieve the ROI, a request by COL Lee for a copy of the ROI under the Privacy Act would necessarily be met with the response that the existence of such records cannot be ascertained. Under Defendant's accounting of the storage and retrieval of the ROI, once the ROI was entered into the system and sufficient time had passed for the personal recollections of Ms. Fears or other officials to fade, there would no possibility of retrieving the requested records. It is nearly inconceivable that a staff member would be assigned the task of knowing the subjects or subject matter of all AR 15-6 reports of investigation maintained by Defendant so that requests for reports of investigations could be responded to.

Defendant might counter that given the USARC Headquarters' relatively small size, a request from COL Lee would only require Ms. Fears or another official to search through all the stored ROIs until the report containing Mr. Lee's name and social security number is located. Under the law of the D.C. Circuit, however, such a system of retrieval would constitute a Privacy

Act "system of records" because "in practice" and "in fact" the ROI is retrieved by an individual's name or other personal identifier. *See Henke*, and *Bartel*, *supra*. The proliferation of sophisticated electronic record-keeping systems, searchable by any of a number of indices, indicates a high likelihood that the USARC's Case Management System can be queried using an individual's name or SSN.

Defendant's accounting of the system in which COL Lee's and other individual's ROIs are maintained evokes the strong language of this Court in *Thompson v. Department of State*, 400 F. Supp. 2d 1, 51 (D.D.C. 2005) (Chief Judge Wald, concurring): "… an agency may not 'squirrel away, deliberately or out of bureaucratic habit, unsubstantiated rumors, McCarthyesque innuendo, [or] unchecked reports of dubious informers or prying neighbors….'" Although the Chief Judge Wald's language is dramatic, expressed therein is the very real concern that courts not allow an agency to frustrate the purposes of the Privacy Act by improperly excluding materials from a system of records in which they properly belong.

Because Defendant has not provided any explanation for the obvious and material deficiencies in his accounting of the storage and retrieval of COL Lee's ROI, summary judgment on this point is improper. The correct course of action is for this Court to deny summary judgment and permit discovery on the issue of whether the ROI is contained in a "system of records" as contemplated by the Privacy Act. Without discovery, COL Lee necessarily cannot provide more than the argument above to counter Defendant's dubious claim.

**2. This Action Seeks The Correction Of Demonstrably Erroneous Facts And Is Not A Collateral Attack On A Federal Official's Exercise Of Judgment**

Defendant's opening salvo advises the Court that "[a]lthough the Privacy Act requires governmental agencies to maintain accurate <u>factual</u> records, it may not be used to collaterally attack a federal official's exercise of <u>judgment</u>." Def.'s Mem. at 8. (Citing *Kleinman v. Dept. of*

16

*Energy*, 956 F.2d 335, 337-38 (D.C. Cir. 1991)).    According to Defendant, "Plaintiff is attempting to alter Colonel McDaniel's and General Kelley's <u>judgment</u> that plaintiff committed misconduct warranting suspension as reflected in the ROI."  *Id*.  (Emphasis added.)

COL Lee takes no issue with the D.C. Circuit's succinct statement of the general parameters of the Privacy Act's amendment provisions. COL Lee takes strong issue, however, with Defendant's assertion that this action is no more than a collateral attack upon the supposed "judgments" of COL McDaniel and BG Kelley. The only "judgments" exercised by COL McDaniel are found in her recommendations which are based solely on her findings of fact. The only "judgments" made by BG Kelley were in issuing COL Lee proposed removals and a 14 day suspension from employment. Such "judgments" were predicated solely on the factual findings of the AR 15-6 investigation.

COL Lee also takes issue with Defendant's desired interpretation and application of the terms "factual records" and "exercise of judgment." Those terms plainly are not synonymous, and no reasonable person would consider them to be synonymous. As is evident in Defendant's contention above, he conflates the terms "factual records" and "exercise of judgment," conveniently transforming any finding of fact that is acted upon by a federal official to the detriment of an employee into a protected "exercise of judgment."

If Defendant's position were correct, the only facts contained in Privacy Act records that would be subject to amendment under the Act would be those that required no independent, cognitive activity for their determination or in their use by the agency. Ostensible examples would include a person's date of birth, social security number, pay grade, date of employment, date of retirement, date of death, *etcetera*. That approach invites open confrontation with the

legislative intent of the Privacy Act and judicial interpretations rendered by this Court, the D.C. Circuit, and other federal courts.

Before addressing the pertinent caselaw and evidence of legislative intent, it is first necessary to review the documents that COL Lee seeks to amend through this action. Contrary to Defendant's argument that COL Lee is mounting a collateral attack on the AR 15-6 and the personnel actions taken against him, what COL Lee seeks is the correction of blatant factual inaccuracies in the documents listed below.

Notices of Proposed Removal

In his notice of proposed removal from federal service issued to COL Lee on March 16, 2004, BG Kelley stated as follows: "I hereby propose to remove you from your position as Program Integrator, GS-301-15, and to terminate your employment in the Federal Service during your initial probationary period. The reasons for this proposed action are: 1) falsification of information in your job application; and 2) misuse of government resources." Admin. Rec. at 532. (Emphasis added.)

After failing to remove COL Lee during his probationary period, by memorandum dated March 29, 2004, BG Kelley issued COL Lee a notice of proposed removal and cancellation of proposed termination during probationary period." The bases for the proposed removal were "1) falsification of information in your job resume; and 2) misuse of government resources." Id. at 534. (Emphasis added.)

AR 15-6 Report of Investigation

As Defendant correctly noted, AR 15-6 establishes the procedures for conducting administrative fact-finding investigations. "The purpose is [for the investigating officer] to conduct a thorough investigation and make findings and recommendations to the appointing

18

authority." Def.s Mem. at 2. "An investigating officer interviews witnesses, obtains statements, and gathers relevant documentary evidence." *Id*.  "An investigating officer's standard of proof in evaluating evidence and making findings is by a preponderance of the evidence. " *Id.*, at 2-3.

The AR 15-6 investigation conducted by COL McDaniel provided the sole factual basis for BG Kelley's proposed removal of COL Lee. COL McDaniel made the factual determinations that: (1) COL Lee "<u>engaged in material misrepresentation on his resume</u> that was used in his selection for employment, misrepresenting information that was necessarily relied on by the hiring officials (Admin. Rec. at 30); and (2) COL Lee "<u>misused his government cellphone</u> during the period of 1 Apr 03 – 31 Oct 03. The total cost of such improper use for the period of 1 Apr 03 – 31 Oct 03 is $1,028.25. (Admin. Rec. at 26)."  (Emphasis added.)

Notice of Suspension of Employment for 14 Days Without Pay

After considering COL Lee's rebuttal to the proposed removal action, BG Kelley suspended COL Lee's employment for 14 days without pay.  BG Kelley's notice of suspension states, "[b]ased on my review of the facts and circumstances in this case, <u>I have determined that the charges of 1) falsification of information in your job application, and 2) misuse of government resources are supported by a preponderance of the evidence</u>."  Admin. Rec. at 595. (Emphasis added.)

Standard Form 50: Notice of Personnel Action

A Standard Form 50, Notice of Personnel Action, was issued and placed in COL Lee's official personnel file, where it remains. Admin. Rec. at 597.  The Standard Form 50 states, "Reason for suspension: <u>Falsification of information in your job application and misuse of government resources</u>."  *Id*.  (Emphasis added.)

Relevant Case Law

In effect, Defendant contends that COL McDaniel's report of investigation and General Kelley's memorandum of reprimand and suspension of COL Lee without pay are no more than "judgments" or "opinions" for purposes of the Privacy Act. Defendant impliedly argues that none of the above Privacy Act records are factual records susceptible of amendment under the Privacy Act. Defendant's argument is undermined by the very nature of AR 15-6 findings and the language employed in the documents themselves. An investigation under AR 15-6 self-evidently is a <u>fact-finding</u> investigation. And as noted above, both COL McDaniel and BG Kelley issued <u>findings of fact</u> that COL Lee falsified his resume and misused government resources.

The proper starting point for analysis here is those cases that have considered the legislative history of the Privacy Act's amendment provisions. In *R.R. v. Department of the Army*, 482 F. Supp. 770 (D.D.C. 1980), this Court considered a claim for amendment under the Privacy Act brought by a former soldier who alleged that his medical records contained factually inaccurate and erroneous information. *Id.*, at 772.  In response the defendant argued that the Act's amendment provisions were limited to "purely factual misrepresentations."  *Id.*, at 774-775.

The Court disagreed, noting, "[i]t would defy common sense to suggest that only factually erroneous assertions should be deleted or revised, while opinions based solely on these assertions must remain unaltered in the individual's official file. An agency may not refuse a request to revise or expunge prior professional judgments once all the facts underlying such judgments have been thoroughly discredited. This position is reinforced in the [Privacy] Act's legislative history, where there are clear indications that insidious rumors and unreliable subjective opinions as well as simple factual misrepresentations fall within the ambit of the Act's

strictures. See e.g., 120 Cong.Rec. 36646-57 (Nov. 20, 1974) (remarks of Rep. Horton at 36646; Remarks of Rep. Gude at 36647; Remarks of Reps. Erlenborn and Goldwater at 36656-57)." *Id.*, at 775.

The Court then noted, "[t]he conclusion that Congress both authorized actions for expungement or revision and intended that such actions apply to <u>errors of judgment or opinion</u> is supported by the relevant case law. Even beyond the domain of the Privacy Act, it is well settled that courts in their <u>equitable discretion may order inaccuracies removed from government</u> <u>records where necessary to vindicate rights secured by statute or by the Constitution</u>. See *Chastain v. Kelley*, 167 U.S.App.D.C. 11, 14-15, 510 F.2d 1232, 1235-36 (D.C.Cir. 1975); *Paton v. LaPrade*, 524 F.2d 862, 868 (3d Cir. 1975). That the Privacy Act contemplates such expungement and not merely redress by supplement is fairly implicit in the decisions of this and other circuits. . . . *White v. Civil Service Comm.*, 191 U.S.App.D.C. 190, 589 F.2d 713 (D.C.Cir. 1978), cert. denied, 444 U.S. 830, 100 S. Ct. 58, 62 L. Ed. 2d 39 (1979); *Churchwell v. United States*, 545 F.2d 59 (8th Cir. 1976)." *Id.* (Emphasis added.)

The Court in *R. R.* granted in part the plaintiff's amendment request, finding that "the factual assertions in the 1951 records concerning plaintiff's dependency on his mother, his lack of education, his failure to hold a job and his prior treatment for a mental condition have been shown conclusively to be false. Plaintiff has submitted persuasive, uncontroverted evidence refuting these assertions. All factual references to his putative family and pre-service history will be either deleted or recharacterized …." *Id.*, at 775. *See also Ertell v. Dept. of the Army*, 626 F. Supp. 903, 911 (C.D.Ill. 1986) ("It is the opinion of this Court that the spirit of the Act, if not its letter, dictates that <u>opinions maintained in and freely disseminated through a system of records,</u> <u>apparently (perhaps admittedly) causing concrete, adverse determinations, and allegedly</u>

grounded on demonstrably (although not proven) erroneous factual bases, are amenable to review with respect to Privacy Act issues." (Emphasis added)); and *Mueller v. England*, 404 F. Supp. 2d 51, 54 (D.D.C. 2006) ("an agency may not refuse a request to revise or expunge prior professional judgments once all the facts underlying such judgments have been thoroughly discredited").

The cases cited by Defendant to support his argument that COL Lee is mounting an impermissible collateral attack on an official's exercise of judgment are inapposite. COL Lee reiterates that his concern in bringing this action is to amend his records to show that he did not falsify his resume or misuse government resources.[2] The records at question were generated more than 2 years ago and COL Lee is no longer employed by the Department of the Army. COL Lee's interest, which is a compelling one, is to correct factual inaccuracies that impugn his moral character and that effectively preclude him from obtaining future federal employment or other employment requiring a national security clearance.

The first case relied on by Defendant, *Kleiman v. Dept. of Energy*, 956 F.2d 335 (D.C. Cir. 1991), concerned a challenge by the plaintiff to his job description and allegations that the duties he performed bore no relationship to that job description. *Id.*, at 336. The plaintiff alleged that his personnel records were inaccurate because they reflected the title, not the work he actually performed, and that the inaccuracies hindered his search for post-governmental employment. *Id.* Kleiman previously had been subjected to a reduction in force and his original job title and duty descriptions were changed as a result. *Id.*

---

[2] Defendant separately argues, at p. 10, ¶ (B) of his memorandum, that the Civil Service Relief Act provides the exclusive remedy for federal employees to challenge personnel decisions. For convenience, COL Lee addresses those arguments in this section.

Addressing the plaintiff's claim, the D.C. Circuit noted, "…Kleiman's – or any other – record can be 'accurate' (or inaccurate) only in relation to the state of affairs it is meant to describe. The forms in Kleiman's file describe his assigned position – they state that his job title was 'Paralegal Specialist,' and list the duties of that position. Kleiman does not contest that was his job title, nor does he contest the description of what this position entails. The records, then, are accurate: they correctly reflect the position to which Kleiman officially was assigned. And while the work Kleiman actually did may have entitled him to be placed in a different category, carrying a different job description (and grade), such 'error' is not the stuff of which Privacy Act suits are made." *Id.*, at 337.

The D.C. Circuit then considered the plaintiff's Privacy Act action in the light of the provisions of the Civil Service Reform Act. According to the court, "[t]he need to read the Privacy Act without doing violence to the Civil Service Reform Act of 1978 … supports our conclusion that the former does not encompass this type of claim. This court has refused to allow 'the exhaustive remedial scheme of the CSRA' to be 'impermissibly frustrated' … by granting litigants, under the aegis of the Privacy Act or otherwise, district court review of personnel decisions judicially unreviewable under the CSRA." *Id.*, at 338 (internal citations omitted). The court then cited several decisions disallowing direct challenges to position classifications brought for the first time in federal district court that were otherwise unreviewable under the CSRA. *Id.* According to the court, "[y]et if we were to allow Kleiman to force DOE to amend his records here, we would be authorizing exactly that." *Id.*

*Kleiman* is distinguishable from the instant case on at least two grounds. First, *Kleiman* did not involve existing personnel and other records containing precise and limited findings of fact generated by an investigation conducted pursuant to AR 15-6 and placed in his record by the

agency, as does the instant case. Nor did Kleiman present cogent evidence that any factual matters in his record were demonstrably incorrect, as does COL Lee.

Second, Kleiman's argument was that he was performing different duties from those stated in his job description and therefore may have been entitled to a different position category and a change of pay grade. The court determined, however, that Kleiman's records were facially correct in that the relevant forms correctly stated his job title and the duties of that position. In effect, the court determined that Kleiman's Privacy Act amendment request was an attempt to amend an otherwise accurate job title and job description and posed a challenge to the agency's original reduction in force and elimination of Kleiman's original position. COL Lee, however, does not allege that he was performing duties different than those contained in his job description, and his claim requires no judicial rewriting of history. Notably, the *Kleiman* court appears to have expressly limited its holding to challenges against job position classifications, a concern not raised by COL Lee. *See also Albright v. United States*, 732 F.2d 181 (D.C. Cir. 1984).

The second case principally relied on by Defendant, *Levant v. Secretary of the Air Force*, 384 F. Supp. 2d 262 (D.D.C. 2005), involved a general officer's challenge to his failure to be selected for promotion to the next higher grade. *Id*., at 264. "Plaintiff's second group of Privacy Act claims flows from his belief that the Air Force's records regarding the 1989 promotion process are not 'accurate' or 'complete' (apparently because they do not reflect the promotion that he feels he was entitled to." *Id*., at 269. The plaintiff sought, *inter alia*, "an order of the Court amending his record to "reinstate or promote him to the rank of Major General." *Id*.

After denying the plaintiff's Privacy Act amendment request on grounds that it was untimely, the Court noted that "plaintiff misunderstands the nature of Privacy Act relief with

respect to the alleged 'inaccuracies' in his record. 'The Privacy Act allows for amendment of factual or historical errors. It is not however, a vehicle for amending the *judgments* of federal officials or others as those judgments are reflected in records maintained by federal agencies.'" Id. (Quoting *Kleiman*, 954 F.2d at 337-338).

Levant plainly was seeking judicial review of his non-selection for promotion, an action that in most instances is non-justiciable under the law of this Court. He failed, however, to specify with any detail whatsoever the alleged inaccuracies in his record, in sharp contrast to the instant case. Levant, in effect, was asking the court to substitute its judgment for that of the promotion selection board, a power that the court simply did not have.

An additional case relied upon by Defendant is *Albright v. United States*, 732 F.2d 181 (D.C. Cir. 1984). Def.'s Mem. at 10. Defendant relies on *Albright* for the general proposition that "'[t]he Privacy Act was not intended to shield … employees from the vicissitudes of federal personnel management decisions.'" *Id.*

*Albright* concerned the videotaping of a conference at which Social Security Administration officials explained to hearing and appeal analysts why the decision had been made to lower the civil service rating, and hence the compensation, for the position of "hearing and appeal analyst." *Id.* at 182. The conference was videotaped. *Id.* Some of the analysts in attendance claimed to have suffered compensable injuries under the Privacy Act as a result of the conference. *Id.* The plaintiff's alleged that the videotaping of the conference violated the Privacy Act. *Id.*, at 184.

At a trial by judge alone in the District Court, the court reviewed the videotape, permitted the examination and cross-examination of witnesses, and posed questions to the plaintiffs. *Id.*, at 182-183. The court granted the defendant's motion for involuntary dismissal at the close of

plaintiff's case, finding that the plaintiffs failed to prove their alleged injuries were caused by the videotaping of the conference, that the defendant had not acted willfully or intentionally, and that the Privacy Act did not authorize recover for emotional injuries accompanied by out-of-pocket expenses.  *Id.*  The D.C. Circuit did not reach the latter claim after rejecting the appellant's other assignments of error.  *Id.*, at 186.

When addressing the issue of causation and damages, the D.C. Circuit concluded, "[a]lthough there was much evidence of emotional trauma and shock suffered by the analysts, there was little indication that these emotional injuries were caused by the relatively innocuous and obvious videotaping, rather than by the Bureau's decision drastically to restrict the analysts prospects for promotion and pay increases. While we understand the distress possibly suffered by the appellants in response to this administrative reclassification of their jobs, the Privacy Act was not intended to shield these employees from the vicissitudes of federal personnel management decisions. The Privacy Act does not entitle disgruntled employees to an award of money damages for emotional injuries in order to recoup salary which they may have lost due to civil service grade changes. … Neither did the appellants present any solid evidence that the Bureau videotaped the meeting for any purpose other than to preserve a record of the meeting for the absent analysts at their request." *Id.*, at 190. Because *Albright* did not involve a records amendment claim under the Privacy Act, it is inapposite.

In contrast to the above cases, COL Lee does not dispute his former job classification, as did the plaintiffs in *Kleiman* and *Albright*. He does not seek to amend records that would result in a retroactive position reclassification with the attendant benefit of back pay and benefits, as in *Kleiman*. He is not challenging the discretionary decision of a promotion selection board, which possesses unique military knowledge and experience mandating extreme judicial deference, as in

26

*Levant*, nor is he attempting a back-door challenge to authorized job reclassifications as in *Albright*.

What COL Lee disputes is the accuracy of two specific findings of fact contained in his Privacy Act records that resulted in an adverse determination against him. His action requires nothing more than a *de novo* determination by this Court of whether the specified factual findings that were relied on to make a determination adverse to COL Lee are accurate or inaccurate. That is a quintessential cause of action under the Privacy Act. "When an agency makes an adverse determination, such as a refusal to hire, and the determination is based on a record that is not maintained with 'such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness,' the aggrieved individual has a cause of action for damages." *Dickson v. OPM*, 828 F.2d 32, 36 (D.C. Cir. 1987). *See Kleiman*, 954 F.2d at 338, note 5 ("This harmony also means that nothing we say today should be taken to cast doubt on *Hubbard's* statement that 'the Privacy Act permits a federal job applicant to recover for an adverse personnel action *actually caused* by an *inaccurate* or incomplete record'").

*The Civil Service Reform Act*

Defendant's arguments that the CSRA provided the exclusive remedy for COL Lee's challenges are curious, as are those advanced by the D.C. Circuit in *Kleiman*, and warrant closer scrutiny.  It is true that the CSRA provides the exclusive remedy for federal employees who desire to challenge adverse personnel actions. As a threshold matter, the CSRA only is applicable where its jurisdictional requisites are established. Where jurisdiction is not established, the CSRA is not triggered and has no bearing on the employee's situation. As Defendant admits, the CSRA offered COL Lee no procedural rights for challenging his 14 day suspension without pay

because the suspension was not an adverse personnel action for CSRA purposes. The CSRA simply was inapplicable to COL Lee's suspension without pay.

In *Kleiman*, the D.C. Circuit was concerned not to allow the Privacy Act's amendment provisions to "do violence" to the CSRA under the facts of that case, discussed *supra*. The court reasoned, in effect, that what Congress prohibited under the CSRA, it also prohibited under the Privacy Act. The court premised its reasoning and conclusions in part on its previous decision in *Hubbard v. EPA*, 809 F.2d 1, 10-11 (D.C. Cir. 1986), in which the majority upheld the district court's concern not to "read the Privacy Act so as to bring it into conflict with the CSRA."

In a concurring opinion in *Hubbard*, Chief Judge Wald disagreed with the majority's approach to possible interactions between the CSRA and the Privacy Act, noting, "I do not agree, however, with the majority's suggestion that serious consideration of a Privacy Act claim in the context of a federal personnel dispute somehow creates a potential conflict with the [CSRA]. Nothing in the wording or legislative history of either Act suggests that is so. Congress recognized clearly that in both Acts, federal employees were primary beneficiaries of its actions. … My concern, of course, is that by its dicta, the majority opinion seeks to initiate a canon of niggardliness in Privacy Act construction or even a presumption of nonapplication in employee disputes that will deprive that Act of its intended effect. I would vigorously resist either approach." *Id.*, at 37-38.

What is most disconcerting about the *Kleiman* decision is the fact that the intent of the plaintiff in challenging alleged factual inaccuracies under the Privacy Act is of absolutely no import. The court succeeded in creating a classic double-bind situation from which there is no apparent escape. Kleiman argued that his intention in bringing suit under the Privacy Act was "to

ensure …that his records accurately and fairly reflect his actual job responsibilities with the federal government." 956 F.2d at 338.

According to the court, "[t]his seems to us a distinction without a difference." *Id*.  The court, after struggling (unnecessarily) to understand how the agency might determine what duties Kleiman actually performed, concluded that "… were Kleiman successful, the agency either would have to amend his forms to state he actually had been employed as a Program Analyst, or place another document in his file stating that, in the government's view, the unamended forms were erroneous. Either way, Kleiman would have achieved the same impermissible result – a collateral attack on the original personnel decision, by-passing the 'exhaustive remedial scheme' provided by Congress." *Id*. (Internal citations omitted).

The court's only explanation for why it could not correct Kleiman's records as requested was that a *de novo* review of the matter before a federal district court was a mechanism Congress "did not provide to a federal employee contesting a classification decision – a decision that can immediately affect the employee's job title, opportunity for transfer, chance for promotion, or income." *Id*.

The court's decision, though it did not expressly say so, appears to have been strongly influenced by the fact that Kleiman had initiated a classification review by OPM in accordance with established procedures. Kleiman then abandoned his request for a classification review and no such review ever occurred. He then filed suit under the Privacy Act.  *Id*. at 337.  The court's decision therefore should be confined to those situations where an employee asks a federal court to do what he or she has not allowed the agency to do and which the agency properly could do.

The Privacy Act is a free-standing statute that imposes very substantial requirements on federal agencies. The Act does not contain any provisions requiring an individual in an

employment dispute to first pursue other remedies through statutes such as Title VII or the CSRA. Fairness to the individuals on whom an agency maintains records is paramount to the Act's purpose. "The Privacy Act establishes as the recordkeeper's polestar, 'fairness' to the individual about whom information is gathered." *Doe v. United States*, 821 F.2d 694, 699 (D.C. Cir. 1987). The amendment provisions of the Act unquestionably were enacted to allow individuals, federal employees and otherwise, to contest the accuracy of agency records and where successful to enjoy the congressionally mandated remedy of the record's amendment or removal. *See R.R. v. Department of the Army*, 482 F. Supp. at 775.

The distinction between factual inaccuracies and agency officials' judgments and decisions takes on great importance here. Where no other federal statute directly provides for the correction of factual inaccuracies in employee records, a Privacy Act claim must lie irrespective of the availability of remedial schemes for challenging federal officials' judgments or decisions. There simply is nothing in the language of the Privacy Act that precludes that conclusion.

Indeed, in many cases no other remedial schemes will be available through which to challenge the alleged factual inaccuracies. For example, if an AR 15-6 investigation or any comparable investigation results in factual findings warranting the 14 day suspension of a federal employee, under Defendant's theory, and a narrow reading of *Kleiman*, the employee will have no recourse under the Privacy Act to demonstrate the inaccuracy of the factual records and obtain their amendment or removal. The Privacy Act's amendment provisions will be emasculated.

If this Court were to adopt and apply here Defendant's argument and the supportive reasoning of the D.C. Circuit in *Kleiman*, the result would be that neither COL Lee nor any other similarly situated individual would be able to challenge factual inaccuracies in Privacy Act

records simply because the CSRA jurisdictionally <u>disallows</u> any challenges to the officials' decisions. It simply cannot be maintained that because Congress elected to prohibit challenges to suspensions of 14 days or less under the CSRA, it also intended to prevent challenges to factual inaccuracies in the records giving rise to the 14 day suspension. Under the position urged upon this Court by Defendant, the mere fact that a successful Privacy Act amendment claim might <u>consequentially</u> require the amendment of records of agency officials' judgments and opinions based on the demonstrated factual inaccuracies is sufficient to disallow the amendment claim. Yet that is precisely the argument addressed and disposed of by this Court in *R. R.*

If judicial actions under the Privacy Act can pose a threat of violence to the CSRA, the reverse also must be true. COL Lee respectfully submits that the correct approach for the Court in this case is to prevent the CSRA from doing violence to the Privacy Act. Because COL Lee is not mounting a collateral challenge to agency officials' judgments and decisions, and because COL Lee did not fail to utilize and exhaust available agency procedures, this case does not entail the concerns that were present in *Kleiman*. The CSRA's remedial scheme simply cannot be frustrated by COL Lee's amendment request under the Privacy Act.

COL Lee respectfully submits that if this Court adopts the approach of Defendant (and *Kleiman*) to exclude consideration of his well-substantiated allegations of factually erroneous records, the Court will have succeeded, or certainly will have come close to succeeding, in creating a *per se* prohibition against Privacy Act amendment requests arising from federal employment disputes. COL Lee encourages the Court to recognize and enforce the important differences between the objectives of the CSRA and the Privacy Act, the latter clearly authorizing challenges to factually erroneous records that result in adverse determinations being

made, even where agency officials' decisions, based on the inaccurate facts, are impugned as a result.

## **CONCLUSION**

Based on the foregoing, COL Lee respectfully submits that this Court should deny Defendant's motion to dismiss or for summary judgment and order a scheduling conference to consider the discovery required.

Respectfully submitted,

/s/

Raymond J. Toney (NY0066)
The Law Office of Raymond J. Toney
34-16 30th Avenue, Third Floor
Astoria, NY 11103
Tel: 718-726-3656
Fax: 718-504-4735
E-mail: rjtoney@rjtlaw.net

*Attorney for Plaintiff*